The plaintiff was injured on November 18, 1993. Defendants paid benefits in respect to her temporary total disability beginning November 23, 1993 through May 15, 1994, according to the parties' stipulation.
Plaintiff moves the Commission to take punitive action due to the defendant's termination of her temporary total disability compensation(TTD) payments on the latter date, without obtaining an approved I.C. Form 24 Application for Permission to Stop Payment of Compensation from the Commission. Defendants argue, correctly, that the Commission would not consider defendants' argument that total disability had ended, presented on the Form 24 or otherwise, because no award of TTD had been entered, by way of either an approved agreement or Commission decision, and thus there was no award which the Commission could determine had or had not been satisfied. A Form 21 agreement to pay temporary total disability compensation had been submitted to the Commission for its approval, but was returned with instructions to correct the average weekly wage and compensation rate. Defendants disagreed with the Commission's method of calculating the comp rate, and thus the Form 21 was never resubmitted. However, they continued to pay TTD for a total of nearly six months.
Prior to the passage of the Workers' Compensation Reform Act of 1994, and its "direct pay" (N.C. Gen. Stat. § 97-18(b)) and "payment without prejudice" (N.C. Gen. Stat. § 97-18(d)) provisions, the employer could only discharge its admitted
liability with payments "so long as the amount of compensation and the time and manner of payment are in accordance with the provisions" of the Act, to be assured by the requirement that an "agreement" had to be "filed with and approved by the Commission" in a "form prescribed by the Industrial Commission." N.C.G.S. §§ 97-17 (1963) and 97-82 (1929). Once approved, the agreement became an award of the Commission, and vested plaintiff with important legal rights, notably the right to have the Commission determine whether its award — to pay weekly benefits during disability, in cases of ongoing temporary total disability — was fulfilled, rather than face a unilateral decision by defendants to cut off benefits. Hepler v. Red Bird Cab, I.C. No. 859934, 30 April 1993, p. 9.(Whether and how this right was enforced varied through the years, but was basically re-established by the Commission's Minutes of May 29, 1990. See Hepler.)
Since the payments here were clearly represented and intended to be compensation, it is within the Commission's discretion to determine whether the interest of justice would be served by allowing a credit for them against compensation subsequently awarded. (An unapproved agreement to pay is voidable. N.C. Gen. Stat. § 97-82.) In order to discourage carriers from neglecting to submit agreements or admissions to the Commission, and thereby avoid the obligation to obtain Commission permission to cease payment pursuant to an award (i.e., the Form 24 process), the Commission has refused credit when it did not affirmatively appear from the circumstances that the defendant had preceded in good faith. See, e.g., Raffield v. U.S. Air, Inc., I.C. No. 136625, 6 December 1994. "Otherwise, compensation defendants could voluntarily pay without offering the claimant the agreement contemplated by the Act (see G.S. §§ 97-17, 18(b) and -82), and thus deny the claimant important legal rights (see Watkins v.Central Motor Lines, Inc., 279 N.C. 132, 137, 181 S.E.2d 588
(1971) [the "presumption of disability"; Hieb v. Howell's ChildCare Center, Inc., N.C. App. No. COA95-766, 2 July 1996, slip opin.
pps. 9-12; N.C. Gen. Stat. § 97-18.1]) unless and until claimant is willing to litigate for them, and even refuse to report the injury to the Commission in violation of § 97-92(a), with the sole consequence being a maximum fine of $25.00." Carlton v. Sara Lee, I.C. No. 040863, 4 January 1994. This discretion is the Commission's only effective tool to prevent a given employer or carrier from "paying off the books" — a practice which, not incidentally, also cheats other employers by shifting premium cost to them though the experience modification process when the higher loss cost cases are disproportionately "turned in".
The law also prohibits substitution of paid leave earned by the employee and other insurance or benefits in lieu of workers' compensation insurance benefits. N.C.G.S. § 97-6; Estes v. N.C.State University [II], 102 N.C. App. 52, 58, 401 S.E.2d 384
(1991); Ashe v. Barnes, 255 N.C. 310, 314, 121 S.E.2d 549 (1961). While denying liability, an employer may pay benefits from a sickness and accident fund or private disability program it finances that provides benefits to disabled employees regardless of the cause of disability, and if it is later finally determined to be liable for compensation, it is entitled to a credit or offset against compensation due pursuant to G.S. § 97-42, Estes v.N.C. State University [I], 89 N.C. App. 55, 58, 61, 365 S.E.2d 160
(1988), unless the Commission determines, in the reasonable exercise of its discretion, that the credit, or some portion of it, should be denied. See, e.g., Church v. Baxter TravenolLaboratories, Inc. 104 N.C. App. 411, 416-17, 409 S.E.2d 215
(1991).
Defendants point out correctly that in Raffield, no Form 21 was submitted at all. Here, one was submitted, along with the Form 22 reflecting her wages paid for work done during nine months of the prior 12, and an average weekly wage based on division of the year's total by 52, rather than exclusion of the summer weeks period in the gap. The Commission's Claims Department returned the Form 21, along with a recalculation based on dividing the wages the employer paid by the 40.85 weeks that plaintiff actually worked for the defendant/employer. It is also noted that the defendants timely submitted to the Commission a Form 19 Employers' Report of Injury, and apparently began paying the benefits they believed were due promptly.
After the effective date of the "direct pay" provision, a defendant in this posture would be expected to file an I.C. Form 60 Employer's Admission of Employee's Right to Compensation — which does not require the agreement of the plaintiff or the Commission to its declarations — stating the average weekly wage and resulting compensation rate the defendant believed, in good faith, to be applicable. N.C. Gen. Stat. § 97-18(b). However, since this avenue was not available to the defendant, and the Commission had not ruled that her temporary total disability had not ended, it would not serve the interest of justice to penalize defendants for paying plaintiff benefits "at the very moment [s]he needs it most". Foster v. Western Electric Co., 320 N.C. 113,117, 357 S.E.2d 670 (1987).
Parenthetically, defendants contested this average weekly wage issue before the Deputy Commissioner, whose holding in favor of the plaintiff (consonant with the Commission's Claims Department's calculations) was not appealed to the Full Commission. In their brief, defendants assert that the Court of Appeals decided the same issue in favor of their position inMcAninch v. Buncombe County Schools, N.C. App. No. COA95-508, 18 June 1996. However, in McAninch, the defendant presented evidence that the plaintiff held a summer job (presumably, the highest paying that she could reasonably get) which paid wages at a lower rate than her 42-week employment with the defendants. Based on this proof that her salary with the defendant did not correctly reflect her "earning capacity", the Court found that her "average weekly wage must then be calculated by aggregating plaintiff's wages from defendant-employer with her wages earned during the ten week summer vacation period and dividing that sum by 52" in order to obtain a result "fair and just" to the employer. At slip opin.
p. 8. There is no evidence here of summer earnings or other proof to suggest that the plaintiff's wage earning capacity prior to the injury was not fairly reflected by her earnings with the defendant-employer. Thus, even in light of McAninch, it appears that the Deputy Commissioner properly calculated the compensation rate based solely on the wages defendant insured. N.C. Gen. Stat. § 97-2(5)[2]; Barnhardt v. Yellow Cab Co., 266 N.C. 419,146 S.E.2d 479 (1996).
Upon review of all of the competent evidence of record, with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
The parties pre-trial agreement is incorporated herein by reference.
* * * * * * * * * * *
Based upon the competent evidence of record, the Full Commission makes the following
FINDINGS OF FACT
1. The Industrial Commission has jurisdiction of this claim, all parties being bound by and subject to the North Carolina Workers' Compensation Act.
2. At all times relevant to this claim, the employer-employee relationship existed between plaintiff Judith Nagorski and the defendant employer Wake County Schools.
3. The employer is self-insured, and Educator Benefits Services was the servicing agent at all times relevant to this claim.
4. As of November 18, 1993, plaintiff was working for the defendant employer as a cafeteria worker in the Wake County Schools. As a cafeteria worker she worked about 9 1/2 months per year.
5. As documented on the Form 22, for the 286 days (40.857 weeks) plaintiff worked for defendant in the year preceding November 18, 1993, she received total wages of $7,495.24. Based upon the number of days worked, this yields an average weekly wage of $183.47, with a corresponding compensation rate of $122.32.
6. On the afternoon of November 18, 1993, while performing her duties as a cafeteria worker, plaintiff sustained an injury by accident when she slipped and fell while putting food in a cooler. The employer has acknowledged this as a compensable injury by accident, although no Form 21 has been approved by the Industrial Commission.
7. The defendants completed a Form 21, which plaintiff signed and which was forwarded to the Commission. However, the Form 21 was returned on or about February 10, 1994 with a note from the Claims Department that defendant needed to verify beginning disability date, since the Form 22 account of days worked and wages paid portrayed average weekly wage of $183.47, and a compensation rate of $122.32. No revised Form 21 was submitted to the Commission.
8. Defendants have paid medical expenses and weekly compensation benefits to plaintiff for temporary total disability from November 23, 1993 through May 15, 1994 at the weekly rate of $96.10.
9. Plaintiff was born on December 27, 1940. Prior to her accident of November 18, 1993, plaintiff had a history of hypertension and heart disease and had two heart bypass surgeries. Despite these health problems, however, she was able to perform her duties as a cafeteria worker.
10. As a result of her accident on November 18, 1993, plaintiff developed low back pain. On the Monday following her fall, November 22, she went to see her family physician, Dr. John Rubino, who ordered various tests including an x-ray and an MRI. The x-ray was negative, except for degenerative changes. The MRI also showed mild early degenerative disc disease at L4-5 and L5-S1, but no herniated discs or stenosis.
11. Dr. Rubino referred plaintiff to Dr. Timothy Garner, a neurosurgeon, whom she saw on December 27, 1993. Dr. Garner conducted a physical examination and reviewed her MRI. He concluded there was no stenosis or herniated disc and no pressure on nerve roots, such that surgery was not necessary. He believed a conservative course of treatment with anti-inflammatories and muscle relaxants and physical therapy was appropriate.
12. On January 14, 1994, plaintiff first saw Dr. Michael Gwinn, who is board-certified in physical medicine and rehabilitation. He reviewed the reports from the radiologist and conducted a physical examination. The significant results from his physical exam were that plaintiff was able to walk on her heels and toes and had no muscle atrophy in the lower extremities, but complained of give-way weakness in the right lower extremity and complained of decreased sensation to light touch and pinprick along the lateral aspect of her right thigh, calf, and foot, with reproduction of her low back pain with passive extension of the right great toe in the prone position. While some findings indicated further studies might be helpful, some indicated a functional overlay, meaning there might not be an organic or physiologic basis for the plaintiff's symptoms.
13. Dr. Gwinn ordered a bone scan of the pelvic area, due to plaintiff's complaints of tenderness over the sacrum and coccyx, and an EMG due to her complaints of numbness of the right leg. The EMG was normal, with no evidence of nerve irritation and the bone scan supported a finding of degenerative changes in the right pars and facet joint at L5-S1. However, these findings did not show any cause for plaintiff's complaints of pain in the sacral and coccyx areas. After reviewing these results, Dr. Rubino concluded that plaintiff's pain was more myofascial or muscular in nature.
14. Dr. Rubino recommended 12 to 18 sessions of physical therapy with emphasis on therapeutic exercises for strengthening the trunk musculature, lower extremities and upper extremities, and improving flexibility. He referred her to Hand and Orthopaedic Rehabilitation Associates (HORA), where she began physical therapy around January 24, 1994.
15. Plaintiff continued with physical therapy through the end of February, 1994, when she began a work hardening program also through HORA. During her physical therapy, plaintiff generally performed all her exercises, although she continued to complain of pain. On January 26, 1994, therapist Katherine Snyder noted plaintiff was very deconditioned and weak. On February 1, Snyder noted plaintiff was slowly making progress, but continued to complain of pain. On February 9, Snyder noted plaintiff demonstrated inconsistencies with pain and weakness complaints.
16. On February 18, 1994, therapist Michelle Cardosi noted that she felt plaintiff would benefit from a work hardening program. Although plaintiff continued to complain of pain, when her workready evaluation was done on February 28, 1994, Cardosi noted no outward signs of discomfort and no significant abnormalities were seen while she was standing or sitting.
17. Around March 1, 1994, plaintiff began the work hardening program at HORA. On March 7, 1994, after interviewing plaintiff, psychologist Victoria Schindeler noted that plaintiff showed a lot of pain behavior and may be difficult to manage in work hardening due to her impaired cardiac function and her high level of stress about her injury. The therapists at HORA were aware of plaintiff's heart problems. After plaintiff complained of angina episodes during exercises, and upon instructions of Dr. Rubino, after March 17, the therapists adhered to a restriction that during exercising, plaintiff's heart rate should not exceed 120 beats per minute.
18. During the work hardening, plaintiff continued to complain of pain and showed signs of symptom magnification. Therapist Michelle Cardosi noted in her report of April 8, 1994 that plaintiff showed pain focused behavior, but that her goals were being met. Cardosi also noted that plaintiff was not highly motivated to return to her work in the cafeteria. In her report of April 15, Cardosi noted that plaintiff showed signs of symptom magnification and that her movement improved with distraction.
19. While participating in work hardening on April 19, 1994, plaintiff was lifting a box weighing about 20.7 pounds from a cart when she lost her balance and fell backward. After her fall, she complained of increased pain in her lower back.
20. Plaintiff returned to see Dr. Gwinn on April 20, 1994. Dr. Gwinn examined her and found that her symptoms were much more severe than what he expected from his physical exam. She continued to have the give-way weakness in the right lower extremity which indicated to Dr. Gwinn that she was not giving full effort. He told plaintiff to return to work hardening for a final evaluation and ordered a new MRI.
21. The MRI results were normal, except for a mild symmetric disc bulge at L5-S1, and Dr. Gwinn found nothing to explain plaintiff's continued complaints of pain. Dr. Gwinn was still of the opinion that plaintiff's pain was myofascial pain and that completing the therapy could be beneficial.
22. A physical capacity evaluation (PCE) was conducted by Michelle Cardosi at HORA on April 27, 1994. The findings showed inconsistent effort with testing. When requested to squat, plaintiff was unable to do so due to pain, but was observed in a full squat position when transferring onto a mat on the floor. Again, it was noted that her trunk movement improved with distraction. Although her dorsiflexors and plantaflexors tested weak, she could toe and heal walk without difficulty, which indicated less than maximum effort. The evaluation showed that even without maximum effort, plaintiff could perform sedentary to light work. Following the PCE, plaintiff was discharged from the HORA program.
23. On May 9, 1994, after reviewing the physical capacity evaluation and the second MRI, Dr. Gwinn found nothing which would prevent plaintiff from returning to her regular duties. The physical capacity evaluation, along with his objective findings indicated that symptom magnification might be present. Dr. Gwinn released plaintiff from his care and to return to work effective May 16, 1994. Dr. Gwinn did not believe her myofascial pain was disabling and also believed that a return to work might actually be beneficial to plaintiff. He found no basis for a permanent impairment rating. The greater weight of the medical evidence of record rebuts the presumption, arising from plaintiff's period of disability due to the accident, that she remained disabled from earning the wages which she was receiving at the time of the injury as of May 16, 1994.
24. Plaintiff did not return to work on May 16, 1994, but rather sought a second opinion from Dr. Rubino, who sent her back to physical therapy. When plaintiff did not return to work, after being released by Dr. Gwinn, the defendant stopped paying temporary total disability benefits.
25. As a result of her injury by accident of November 18, 1993, plaintiff was temporarily totally disabled from November 23, 1993 through May 15, 1994. She was capable of returning to work on May 16, 1994, when she was released to return to work by Dr. Gwinn.
26. Plaintiff's refusal to return to work after being released by Dr. Gwinn was not justified. The plaintiff's contention that she was unable to return to her employment is not supported by the greater weight of the evidence, which indicates plaintiff's continued symptom magnification and lack of effort on the physical capacity evaluation and lack of motivation to return to work. Her pain complaints were inconsistent with objective findings made by Dr. Gwinn, which failed to show any physical reason for her continued complaints of pain. Even if she still had some level of myofascial pain, it was not disabling.
* * * * * * * * * * *
The foregoing stipulations and findings of fact engender the following
CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage should be calculated based upon the actual wages paid and insured by, and weeks worked with, the defendant employer. N.C. Gen. Stat. § 97-2(5)[2];Barnhardt v. Yellow Cab Co., 266 N.C. 419, 146 S.E.2d 479 (1996); Larson's, Workmen's Compensation Law, Section 60.22(a) (1993);Liles v. Faulkner Neon Electric Co., 244 N.C. 653, 660-61,94 S.E.2d 790 (1956).
2. As a result of her compensable injury by accident of November 18, 1993, plaintiff was temporarily totally disabled from November 23, 1993 until May 15, 1994, when she was released to return to work by Dr. Rubino. Therefore plaintiff is entitled to compensation at the rate of $122.32 per week for the entire period of her disability from November 23, 1993 through May 15, 1994, less credit for the $96.10 paid weekly during that period.
3. Plaintiff's refusal to return to work after May 15, 1994 was not justified, and therefore she is not entitled to any compensation during the continuance of such refusal. N.C. Gen. Stat. § 97-32.
4. Plaintiff's medical treatment by Dr. Rubino after May 15, 1994 has not been shown to be medically necessary to treat the plaintiff's compensable injuries. N.C. Gen. Stat. § 97-25.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law engender, the Full Commission enters the following
AWARD
1. Defendants shall pay plaintiff the difference between the compensation previously paid at the rate of $96.10 per week and the compensation due at the rate of $122.32 per week for the period of November 23, 1993 through May 15, 1994, subject to a reasonable attorney's fee hereinafter approved.
2. Defendants shall pay for all medical compensation shown to be reasonably necessary as a result of the compensable injury on November 18, 1993.
3. A reasonable attorney's of one-fourth of the compensation due and still owing to plaintiff is hereby approved for plaintiff's counsel.
4. Plaintiff's motion for attorney's fees pursuant to Industrial Commission Rule 802 is DENIED.
5. Plaintiff's claim for additional temporary total disability benefits after May 15, 1994 is DENIED.
6. Defendants shall pay the costs due this Commission.
 S/ ________________ J. RANDOLPH WARD COMMISSIONER
CONCURRING:
S/ _______________ COY M. VANCE COMMISSIONER
S/ _________________ DIANNE C. SELLERS COMMISSIONER
JRW:md